587 So.2d 183 (1991)
STATE of Louisiana, Plaintiff-Appellee,
v.
Larry MOODY, Defendant-Appellant.
No. CR 91-67.
Court of Appeal of Louisiana, Third Circuit.
October 2, 1991.
*185 C.R. Whitehead, III, Natchitoches, for defendant-appellant.
Michael Henry, Dist. Atty., Natchitoches, for plaintiff-appellee.
Before GUIDRY, YELVERTON and KNOLL, JJ.
KNOLL, Judge.
Defendant, Larry Moody, appeals his conviction of second-degree murder (LSA-R.S. 14:30.1) and contends the trial court erred in failing to sustain his Batson[1] objection to the State's peremptory challenges of five blacks on voir dire examination. Defendant also contends there is insufficient evidence to support the conviction.

FACTS
On February 10, 1990, a group of students from Northwestern State University attended a local beauty pageant. After the pageant, the group made their way to several local bars during the evening.
At approximately 2:00 a.m., the group walked from a bar closing for the night across the street to the Cotton Patch restaurant. As the victim, Jon Weyand, and his fraternity friends approached the parking lot of the Cotton Patch, a fellow fraternity brother began arguing with a man from a rival fraternity. The dispute involved only pushing and shoving and the two were separated without incident.
As soon as that disturbance was quelled, Stan Broome, a fraternity brother, spotted a fight involving numerous black men and Jay Ingram, a fraternity brother. Because Jay was on the ground and being kicked by the group, Stan jumped in and shielded Jay from the blows. As he looked up, Stan saw Jon Weyand struggling with another group of black men over a shotgun. Then, Stan heard two shots from a small caliber handgun and one shot from the shotgun. After the shooting, the crowd dispersed.
Joseph Blackshire, originally arrested and charged with the victim's killing, testified that he, defendant, and a couple of friends arrived at the Cotton Patch around 2:00 a.m. after an evening of drinking. Blackshire saw several people fighting in the parking lot and attempted to stop the fight by firing his .25 caliber handgun into the air twice. The fighting stopped only momentarily. Blackshire and the others began urging on the fight by shouting instructions. Several fraternity brothers took issue with their actions and approached the Blackshire group. Words progressed to shoving matches, and ultimately, to fighting.
Jon Weyand entered the convenience store adjacent to the parking lot where he worked part-time and emerged with a single shot shotgun. He approached the crowd with the shotgun pointed upwards and directed the Blackshire group to leave. Bruce Davenport, a man from the Blackshire group, lunged forward and began wrestling with the victim over the shotgun. As several others joined in the struggle, Blackshire saw defendant run to Jon Weyand and shoot him in his side at point blank range. Then, Blackshire heard a blast from the shotgun. Davenport took the shotgun from the victim and began hitting people. The crowd then began dispersing and the police arrived.
In a statement to police on March 14, 1990, defendant admitted to shooting Jon Weyand in his side at close range with the *186 .25 caliber pistol and later hiding the gun in a remote area of Natchitoches Parish. However, two days later, defendant recanted his confession.
At the trial on September 25, 1990, defendant was convicted as charged of second-degree murder by a jury composed of ten white jurors and two black jurors. The jury verdict was 11 to 1.

BATSON CHALLENGE
Defendant contends the trial court erred in not sustaining his Batson objection to the State's peremptory challenges of five prospective jurors who were black.
LSA-C.Cr.P. Art. 795 provides in pertinent part:
"C. No peremptory challenge made by the state shall be based solely upon the race of the juror. Whenever it appears that the state is systematically excluding jurors on the basis of race, the defense may demand a disclosure of reasons for the challenge. Neither the demand nor the disclosure shall be made within the hearing of any juror or prospective juror.
D.(1) When a demand for disclosure has been made under Paragraph C of this Article, the court shall determine whether there exists an apparent systematic exclusion of jurors on the basis of race.
(2) In making this determination, the court shall not consider any jurors who have been peremptorily challenged by the defense or who have been excused for cause.
(3) If the court finds an apparent systematic exclusion upon the basis of race, it shall then require a statement of reasons for the exercise of peremptory challenges, but only as to those jurors considered in making the finding of apparent systematic exclusion.
E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral reason is given. Those jurors who have been peremptorily challenged, and for whom no satisfactory racially neutral reason is given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge, and shall give specific reasons for the corrective action taken."
This article is based on Batson, supra, in which the Supreme Court stated:
"To establish such a case [of purposeful discrimination], the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race....

* * * * * *
Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." (Citations omitted.)
Id. 106 S.Ct. at 1723.
In the case sub judice, the record discloses that the trial court properly overruled defendant's Batson objections.
Following defendant's objection, the trial court held a Batson hearing in which the prosecutor was questioned about the five peremptory challenges. The record shows the prosecutor offered the following reasons at the Batson hearing for excusing the five black prospective jurors.
The prosecutor challenged Melvin Pierce and Thomas Anthony because the District Attorney's office of Natchitoches Parish was involved in an on-going investigation of a ten-day-old homicide involving a co-employee of the two prospective jurors as the alleged killer. The prosecutor acknowledged that either would have been a good juror, but was concerned about their feelings towards the prosecutor's office for *187 ultimately not filing charges against their co-employee for the homicide and their feelings about the homicide in general.
The prosecutor challenged Phil Davis, Jr. because of extensive collection activity pursued in his civil practice against Davis' father on numerous occasions. The prosecutor felt that there might be feelings of animosity toward him which in turn might taint the jury.
The prosecutor challenged another prospective juror, Charlie Wolf, because of Wolf's back problems and because of the District Attorney's office's involvement in two narcotics cases with two arrestees named Wolf. The prosecutor explained that although he did not know whether Charlie Wolf was related to either of the arrestees, that possibility along with Charlie Wolf's back problem and his open complaints about serving on the jury prompted the peremptory challenge.
Finally, the prosecutor challenged Katie Stewart because of her three-year employment at a local bar that he referred to as a "dive". He explained that his office occasionally investigates and prosecutes crimes occurring at that local bar and was concerned about her ability to be an impartial juror.
In each of the peremptory challenges, the record supports that the prosecutor's motivation stemmed from the possibility of a prospective juror's ability to be impartial rather than on the basis of race. We find that the prosecutor gave satisfactory racially neutral reasons for peremptorily challenging the five black prospective jurors. The prosecutor's explanations do not support an inference of discrimination against black jurors. This assignment is without merit.

SUFFICIENCY OF THE EVIDENCE
Defendant contends there is insufficient evidence to support the conviction, and that the State failed to prove that the homicide was not committed in self-defense or in defense of others.
Second-degree murder is the killing of a human being where the offender has specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10. Specific criminal intent may be inferred from the circumstances present in the case and the actions of the defendant. State v. Broussard, 560 So.2d 694 (La.App. 3rd Cir.1990). Aiming a firearm directly at a victim is indicative of intent to kill or inflict great bodily harm. State v. Maxey, 527 So.2d 551 (La.App. 3rd Cir.1988), writ denied, 541 So.2d 868 (La. 1989).
A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. LSA-R.S. 14:20.
A person may kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person. LSA-R.S. 14:22.
A claim of insufficient evidence is judged by whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
On appeal, the applicable standard when the defendant asserts justification as a defense to the crime, is whether a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in defense of others. State v. Matthews, 464 So.2d 298 (La.1985), on remand, 468 So.2d 1333 (La.App. 1st Cir.1985); State v. Freeman, 447 So.2d *188 1145 (La.App. 3rd Cir.1984), writ denied, 449 So.2d 1356 (La.1984).
In the case sub judice, all of the circumstances surrounding the shooting as shown by the record, support a deliberate and intentional killing of Jon Weyand by defendant.
Blackshire who was a friend of defendant and an eyewitness to the shooting, testified that defendant placed the handgun against Jon Weyand's side during the struggle and fired once. Blackshire vividly described the shot as black gunpowder flying out of Jon Weyand's side. Blackshire further testified, as well as Allison Bolton, Bruce Davenport and Chris Fisher that after the shooting they all met at Alvin Davenport's home, and that Chris Fisher and defendant argued over "who shot the white boy". In addition, defendant confessed to the shooting and informed police where he hid the murder weapon.
Testimony concerning the forensic evidence also points to defendant. Dr. Charles E. Cook, the coroner of Natchitoches Parish, testified that Jon Weyand died of one gunshot wound to the side. The bullet entered the body through the left thoracic cage, traveled through the left lung, the heart, the right thorax, and stopped just underneath the right nipple. The bullet was removed from the body and compared with test bullets fired from defendant's pistol. Richard Beighly, an expert in firearms identification, testified that the bullets matched and defendant's pistol was the murder weapon.
Considering the evidence adduced at trial, and viewing it in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of second-degree murder beyond a reasonable doubt.
The evidence also shows that the killing of Jon Weyand by defendant was not justified. Belying his claim of self-defense, the record shows that defendant approached Jon Weyand from his place of apparent safety as a bystander to intervene. Also, Blackshire testified that moments before the shooting, he overheard defendant say in an angry tone that no one was going anywhere because he had been punched in the eye. Blackshire candidly admitted at trial that he did not feel threatened by Jon Weyand's brandishing a shotgun, and, had he felt threatened, he would have shot Jon Weyand with his own pistol. Also, Blackshire, Stan Broome, Chris Dezendorf, Steven Spenser, and Chris Fisher all testified that Jon Weyand pointed the shotgun upward the entire time and never pointed it at anyone. Only Bruce Davenport testified that Jon Weyand pointed the shotgun at him and shouted a racial epithet. Defendant's actions resulted from anger rather than from an altruistic duty to defend Bruce Davenport. The evidence, viewed in the light most favorable to the prosecution, convinces this court that a rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in defense of others. This assignment is without merit.

HEAT OF BLOOD
Finally, defendant contends that the offense was committed in heat of blood and the evidence supports a conviction of manslaughter (LSA-R.S. 14:31).
Manslaughter is defined as:
"A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed;"
LSA-R.S. 14:31.
Manslaughter is the killing of a human being under certain mitigating circumstances (heat of blood or sudden passion) which prevent the crime from being second-degree murder. State v. Batiste, 410 So.2d 1055 (La.1982). Once the jury finds the elements of second-degree murder then it *189 has to determine whether the circumstances indicate that the crime was actually manslaughter. State v. Maddox, 522 So.2d 579 (La.App. 1st Cir.1988).
The standard on review is, viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, 486 So.2d 106 (La.1986).
We have carefully studied the record and conclude that a rational trier of fact could have found that mitigatory factors were not proven by a preponderance of the evidence. Therefore, the reduction of the offense to manslaughter would not be proper as the record evidence supports a conviction of second-degree murder.
For the foregoing reasons, defendant's conviction is affirmed.
AFFIRMED.
NOTES
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).