771 So.2d 723 (2000)
STATE of Louisiana
v.
Jeffery A. STEWART.
No. 00-0143.
Court of Appeal of Louisiana, Third Circuit.
October 4, 2000.
*724 Loren Lampert, Asst. Dist. Atty., Alexandria, LA, Counsel for Plaintiff/Appellee.
Lawrence C. Billeaud, Lafayette, LA, Counsel for Defendant/Appellant.
(Court composed of Chief Judge NED E. DOUCET, Jr, and Judges GLENN B. GREMILLION, and ELIZABETH A. PICKETT).
PICKETT, Judge.
The defendant, Jeffrey Allen Stewart, seeks review of his conviction. The defendant *725 was indicted by a grand jury on November 19, 1998, with the offense of second degree murder in violation of La. R.S. 14:30.1(A)(1). The defendant waived his right to a trial by jury and, following a three-day bench trial, was convicted as charged on September 16, 1999. A motion for an acquittal or for a new trial was denied following a hearing on November 9, 1999. Jeffrey Allen Stewart was subsequently sentenced to life in prison without benefit of parole, probation, or suspension of sentence.

Facts
On the evening of October 16, 1998, while Connie Stewart was at work, her husband Jeffrey Allen Stewart invited his mother and sister Diana Stewart to his home. There had been some strife between Connie and his mother and the defendant called them there for a "family meeting" in hopes of settling the dispute, according to his testimony. He did not tell Connie beforehand about the meeting.
When Connie arrived home from work, she found her husband, sister-in-law, and mother-in-law at her home. She went straight to her bedroom and changed clothes. When she did not quickly emerge, the defendant went into the bedroom and asked her to come out and talk to his mother and sister. Connie did so and had a conversation with the two that lasted about an hour. While they talked, the defendant did some paperwork.
Following the meeting, the defendant drove his mother and sister home.
Approximately one-half hour later, the defendant called his mother's house and told Diana he had shot Connie. Diana and Mark Cencinat, defendant's brother-in-law, arrived at the defendant's home within minutes and found the door locked. They knocked on the door and the defendant admitted them into the house after Diana told him she needed to come in and tend to Connie.
A call was placed to 911 and Diana attempted to revive Connie with no success. Connie died at the scene, having received four gunshot wounds to her head.

Discussion
In his sole assignment of error, the defendant argues there was insufficient evidence for the trial court to convict him of second degree murder. Specifically, the defendant maintains that the record is void of any evidence that he did not kill his wife in the heat of passion and that the State failed to rebut the evidence of a heat-of-passion killing.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State v. Moody, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses. An appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983), citing State v. Richardson, 425 So.2d 1228 (La.1983)
In order to convict him of second degree murder, the State had to prove beyond a reasonable doubt that the killing was done with the specific intent to kill or inflict great bodily harm. La. R.S. 14:31 A(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific criminal intent is a state of mind and need not be proven as fact, but may be inferred from the circumstances present in the case and from the action of the defendant. State v. Carroll, 95-859 (La.App. 3 Cir. 1/31/96); *726 670 So.2d 286. The severity of the attack on the victim is an indicator of the defendant's specific intent to kill. State v. Myers, 584 So.2d 242 (La.App. 5 Cir.), writ denied, 588 So.2d 105 (La.1991), cert. denied, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992); State v. Segura, 464 So.2d 1116 (La.App. 3 Cir.), writ denied, 468 So.2d 1203 (La.1985).
The defendant does not dispute that he killed his wife. He argues, however, that the killing was actually manslaughter and not second degree murder.
La. R.S. 14:31 A(1) defines manslaughter as:
A. Homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled at the time the offense was committed.
When the fact finder, in this case, the judge, finds the elements of second degree murder, it then must be determined whether the circumstances indicate the crime was actually manslaughter. State v. Jack, 596 So.2d 323 (La.App. 3 Cir.), writ denied, 600 So.2d 611 (La.1992). To reduce second degree murder to manslaughter, a defendant must present evidence to show by a preponderance that the homicide was committed in "sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. State v. Lee, 498 So.2d 1177 (La.App. 3d Cir.1986), writ denied, 504 So.2d. 874 (La.1987). "Sudden passion" and "heat of blood" are not elements of the crime of manslaughter. They are factors which mitigate against finding a defendant as culpable as a person who commits a homicide without the occurrence of any extenuating event. State v. Lombard, 486 So.2d 106 (La.1986).
The discharging of a firearm aimed directly at a victim is indicative of intent to kill or inflict great bodily harm. State v. Maxey, 527 So.2d 551 (La.App. 3 Cir.1988), writ denied, 541 So.2d 868 (La.1989), State v. Moody, 587 So.2d 183 (La.App. 3 Cir. 1991). Considering the fact that the defendant shot Connie four times in the head and the other circumstantial evidence presented a trial, a rational trier of fact could have found beyond a reasonable doubt that the defendant had the specific intent to kill or inflict great bodily harm to his wife. Thus, the burden shifted to the defense to establish that Connie provoked the defendant immediately prior to the shooting to the extent that would deprive an average person of self-control and cool reflection.
The defendant presented testimony of a troubled marriage. Apparently there had been marital difficulties for some time. There was no testimony that would establish any history of violence in the marriage. There was evidence that Connie had planned to leave the defendant. The defendant had quit his job with a security company a few days prior to the shooting. When he turned in his uniforms and gun the day prior to the shooting he told, his supervisor and employer that he felt like using the gun on his wife. The defendant admitted making the remark but "not exactly those words," and claimed he was joking and it was an offhand remark.
He denied he ever had any intent to kill Connie. He testified that upon returning home from taking his mother and sister home he commented to Connie that she was not wearing her rings. According to the defendant, Connie informed him that the marriage was over. The defendant testified that he went into the boys' room and laid down and thought of how she had hurt him. He said he was hurting "big time" because he felt their marriage was one-sided and that he was trying everything *727 to make it work while she was trying to find a way to end it. The defendant said he was trying to think of a way to hurt Connie which led him to thoughts of disposing of her .38 revolver which he described as her prize possession.
The defendant explained that he left the bedroom, walked past Connie sitting at the breakfast bar and into their bedroom. He locked the door and proceeded to get her gun. The defendant testified that he considered tossing the gun in the lake. He described his thoughts of possibly ending his life because of Connie's threats to take his daughter away. The defendant maintained that he did not decide to kill Connie at that point. The defendant explained that Connie knocked on the door and asked for her purse. After giving Connie her purse, the defendant testified that he left the bedroom with the gun in the back of his pants. As he approached the breakfast bar, Connie commented, "I guess your mom's won again," and then laughed at him when he asked what she meant by her comment. The defendant admitted that her comment upset him and that he had been upset for several days. He noticed that Connie had taken out her keys so he asked her where she was going. According to the defendant, Connie yelled that it was none of his business and that he did not understand.
The defendant testified that he pulled out the gun, pointed it to his head and said, "[W]ell, maybe this will make it my business." The defendant maintained that he had no intent to kill Connie when he took the gun out of his pants, or when he aimed the gun at his head. Connie turned around and replied, "Go ahead." According to the defendant, the gun went off, sending a bullet through the ceiling, but missing himself. He testified he had no intent to kill Connie after he fired the bullet. The defendant stated that Connie started laughing at him and taunting him, and explained, "That's where a big blaze of light, like everything just went white. And itthe next thing I knew, there there she was, lying on the floor. And that's what happened."
Dr. Paul Ware, a psychiatrist, testified as an expert on behalf of the defendant. Dr. Ware opined that the culmination of the defendant's marital problems combined with the events of the evening prior to the shooting caused the defendant to lose control. However, when Dr. Ware was asked if it was his opinion that the defendant's actions in response to his wife's alleged provocation were reasonable when compared to the rest of mankind, Dr. Ware replied "No". Dr. Ware's testimony fails to establish that the alleged taunting of the defendant by the victim was sufficient to deprive an average person of his self-control.
The trial judge rejected the defendant's explanation of how the homicide occurred. At the hearing on the defendant's Motion for a New Trial, the judge specifically stated "... when you went to go get that gun you had every intention of doing exactly what you did."
When viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the State proved the elements of second degree murder beyond a reasonable doubt. Further, a rational trier of fact could have found that the defendant failed to establish sufficient provocation in the instant case to reduce the homicide to manslaughter.
Accordingly, the conviction and sentence are affirmed.
AFFIRMED.